UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
: 
In re:                                                       :        Chapter 11
                                                             :
WALKER SERVICE CORP., *et al.*,                              :        Case No.20-41759
                                                             :
                                    Debtors. [1]             :        (Joint Administration Requested)
                                                             :
-------------------------------------------------------------X

**FIRST DAY AFFIDAVIT OF JOE PROSS**
**PURSUANT TO RULE 1007-4 OF THE LOCAL BANKRUPTCY**
**RULES FOR THE EASTERN DISTRICT OF NEW YORK**

STATE OF NEW YORK             )
                             ) ss.:
COUNTY OF KINGS              )

Joe Pross, being duly sworn, deposes and says:

1.      I am a Member, or otherwise oversee the management, of each of Walker Service Corp., T & L Cab Co. Inc., Zion Taxi, Inc., Stinger Taxi Inc., Seven Transit, LLC, Nicolette Transit, LLC, Slepchik Transit, LLC, Larry's Cab Company, LLC, Lawrence Transit, LLC, Yoha Transit, LLC, Quartermoon Hacking Corp., Miranda Transit, LLC, Betty Transit, LLC, Lev Transit, LLC, Sima Hacking Corp., Lyuba Hacking Corp., Trot Service Corp., Cirrus Hacking Corp., Cyclonic Hacking Corp., Laddie Cab Corp., and Vermouth Taxi Inc., the above-captioned debtors and debtors in possession (each a "Debtor," and collectively, the "Debtors"). I have served

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are (i) Walker Service Corp. (0301); (ii) T & L Cab Co. Inc. (3724); (iii) Zion Taxi, Inc. (2389); (iv) Stinger Taxi Inc. (7748); (v) Seven Transit, LLC (6442); (vi) Nicolette Transit, LLC (0225); (vii) Slepchik Transit, LLC (8161); (viii) Larry's Cab Company, LLC (8089): (ix) Lawrence Transit, LLC (8283); (x) Yoha Transit, LLC (8135); (xi) Quartermoon Hacking Corp. (8122); (xii) Miranda Transit, LLC (6487); (xiii) Betty Transit, LLC (8319); (xiv) Lev Transit, LLC (8201); (xv) Sima Hacking Corp. (9453); (xvi) Lyuba Hacking Corp. (9451); (xvii) Trot Service Corp. (5401); (xviii) Cirrus Hacking Corp. (5391); (xix) Cyclonic  Hacking Corp. (2980); (xx) Laddie Cab Corp. (8009); and (xxi) Vermouth Taxi  Inc. (9070). The Debtors' mailing address is 465 Utica Avenue, Brooklyn, NY 11203.

in this capacity since each of the Debtors were established and I have managed the Debtors' integrated business enterprise since 1985. In these capacities, I have become generally familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      I submit this affidavit (the "Affidavit") pursuant to Rule 1007-4 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), filed on March 27, 2020 (the "Petition Date"), and the Debtors' various first day applications and motions contemporaneously filed herewith (the "First Day Pleadings"). I have reviewed the Debtors' petition and the First Day Pleadings, and it is my belief that they are true and accurate to the best of my knowledge, and the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses while they seek to administer these cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") , and successfully reorganize pursuant to a chapter 11 plan for the benefit of their estates.

3.      Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge, my review of relevant documents, conversations with professionals retained by the Debtors (including, Griffin Hamersky LLP), or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the industry in which they operate as a whole. I am authorized to submit this Affidavit on behalf of the Debtors, and if called upon to testify, I would testify competently to the facts set forth herein. Unless otherwise indicated, the financial information contained in this Affidavit is unaudited.

4.      The Affidavit is divided into four parts.  Part I offers a discussion of the Debtors' history, business operations, and significant prepetition indebtedness.  Part II addresses the events leading to the filing of the Chapter 11 Cases, including the decline in their businesses,

the cause for such decline, and efforts made by the Debtors' management to stabilize and restructure their financial and operational affairs. Part III sets forth information required by Local Rule 1007-4 to the extent not otherwise provided herein. Part IV discusses the relevant relief sought in the Debtors' First Day Pleadings and the grounds for such relief.

**I.**
**The Debtors' Business**

**A.**     <u>Company History</u>

5.     My wife and I immigrated to the United States of America in 1975 and upon arriving here, I initially began working in construction. In addition to working construction at the former World Trade Center, I took a second job driving a cab.

6.     In 1977, my wife, Sophie Pross, who was working as a seamstress, and I were fortunate enough to be able to save enough money to purchase our first New York City taxi medallion (each a "<u>Taxi Medallion</u>"). I personally drove the taxi associated with the Taxi Medallion for several years.

7.     Over the course of the ensuing few years, my wife and I purchased several additional Taxi Medallions. Because the New York City Taxi and Limousine Commission requires that at most two medallions be held by any one entity, my wife and I formed distinct companies (collectively, the "<u>Medallion Holding Companies</u>") for the sole purpose of holding these Taxi Medallion we purchased.

8.     In 1985, I formed Utica Taxi Center, Inc. ("<u>Utica Taxi</u>") to manage and otherwise oversee the operations of the various Taxi Medallions we owned through the individual Medallion Holding Companies.

9.     My wife and I have owned and operated Utica Taxi and Medallion Holding Companies (and their associated Taxi Medallions) it manages, on a daily basis for approximately

35 years. Over the past year, Utica Taxi has employed between 19-21 employees, including, but not limited to, dispatchers, mechanics and gasmen.

**B.**     The Debtors' Management and Business Operations

10.     The Debtors do not have any employees.

11.     Each of the Debtors is party to a NYC Taxi Medallion Management Agreement with Utica Taxi (each a "Utica Taxi Management Agreement"). Each Utica Taxi Management Agreement is reviewed and renewed on a bi-annual basis. The current Utica Taxi Management Agreements are dated December 21, 2019.

12.     Pursuant to the Utica Taxi Management Agreements, the Debtors grant Utica Taxi the exclusive right to manage, operate, and lease the Taxi Medallions held by the Debtors in exchange for a fixed monthly fee of $1,400 to each Debtor. As additional consideration for the right to operate and lease the Taxi Medallions, pursuant to the Utica Taxi Management Agreement, Utica Taxi pays all operational expenses, including legal fees, of the Debtors and specifically assumes liability for the Debtors' workers' compensation, general insurance, vehicle maintenance and inspections, tax stamps, and all renewal fees.[2]

13.     None of the Debtors maintain a bank account. Prior to the Petition Date, the monthly leasing fees paid by Utica Taxi to the Debtors, were reflected as intercompany transfers in the Debtors' and Utica Taxi's books and records. To the extent that the Debtors are able to resume operations during the pendency of these Chapter 11 Cases, each Debtor will establish a debtor in possession bank account that is compliant with the U.S. Trustee's Operating Guidelines and 28 U.S.C. §586(a)(3).

---

[2]   Although Utica Taxi maintained general liability insurance for the Debtors' benefit through Washington International Insurance Co., such insurance policies were cancelled on March 25, 2020 as the Debtors have suspended operations for March, April, and possibly May 2020.

14.     As discussed above, the Debtors have essentially outsourced its operational functions to Utica Taxi, a non-debtor, pursuant to the Utica Taxi Management Agreements. This arrangement allowed the Debtors to consolidate its overhead expenses and efficiently manage the Taxi Medallions.

15.     The Utica Taxi Management Agreements are necessary and critical for the efficient and orderly operation of the Debtors' businesses, which the Debtors expect to resume after the COVID-19 pandemic has subsided.

**C.**     The Debtors' Prepetition Indebtedness

16.     Over the years, the Debtors have been conservative in managing their debt load and have only ever refinanced the Taxi Medallions when it was economically necessary. In 2017, the Debtors refinanced 16 of their existing loans with Progressive Credit Union (n/k/a Pentagon Federal Credit Union ("PenFed")), in order to lower the Debtors' monthly loan payments and debt service and reduce the interest rate these loans were subject to. In order to enter into this 2017 refinancing, each of the Debtors pledged all of their assets as collateral for each of the 16 refinanced loans.

17.     Currently, there is an aggregate outstanding loan balance due to PenFed from the Debtors of $18,696,095.00 (the "PenFed Loans"), which far exceeds the value of the pledged collateral. The total monthly installment payments required to service the PenFed Loans equal $105,610.08. By contrast, in 2019, the Debtors aggregate average monthly incoming cash flow before debt service was approximately $29,400. The Debtors were unable to satisfy the monthly loan payments due to PenFed prior to the COVID-19 crisis. In light of the current pandemic, making *any* payments toward the PenFed Loans is simply not feasible.

18.     Aside from any under-secured obligations due to PenFed, the Debtors have no other unsecured current liabilities.

19.     While it was necessary to seek chapter 11 protection for the Debtors, Utica Taxi is not seeking chapter 11 protection at this time. However, the proliferation of ride sharing apps such as Uber and Lyft, as more fully discussed below, combined with the economic devastation associated with the COVID-19 pandemic, may eventually render Utica Taxi bankrupt as well.

## II.
## Circumstances Leading to These Chapter 11 Filings

**A.**     Decline in Financial Performance

20.     For over 25 years, the Taxi Medallions were the basis of a profitable integrated business enterprise. However, that abruptly changed with the advent of ridesharing apps such as Uber and Lyft.

21.     The impact of Uber and Lyft is apparent to any reasonable adult living in and around New York City and I will not burden this Court with the figures surrounding the decreased ridership in New York City taxis. The bottom line, according to Forbes, is that taxi medallions once worth millions were worth as little as $175,000.00 starting in 2014.

22.     Since 2014, the Debtors have been operating at an annual loss, which has forced my wife and I to personally contribute between $400,000.00 and $600,000.00 a year simply to operate the Debtors' businesses and service the Debtors' debt.

23.     Subsequent to the advent of ridesharing apps, one of the few remaining lifelines for the Taxi Medallions was the reliability of fares obtained from passengers arriving at the New York City airports. However, that too abruptly changed in recent years when New York City changed its regulations to permit Uber and Lyft to compete for passengers at John F. Kennedy and LaGuardia Airports.  As a result, the Washington Post asserts that the value of taxi medallions "have plunged to as little as $150,000" as of 2019.

24.     These challenging industry dynamics, described above, substantially contributed to the decline of the Debtors' business and the taxi medallion industry in New York City, generally. The current COVID-19 pandemic has now rendered the Debtors with virtually no income to operate its businesses, as the Debtors have recently suspended operations during the COVID-19 pandemic for March, April and possibly May 2020. The Debtors expect to resume operations once the COVID-19 pandemic has subsided.

**B.**     The Debtors' Renegotiation Efforts

25.     In December 2019, the Debtors engaged Griffin Hamersky LLP to assist them in their attempts to renegotiate the PenFed Loans. The economic realities of the Debtors' business and the taxi medallion industry, at large, clearly could not sustain the existing monthly installment payments required by the PenFed Loans.

26.     Over the past few months, the Debtors, through Griffin Hamersky LLP, have participated in numerous telephonic negotiations with PenFed and provided PenFed with voluminous financial disclosures that unambiguously demonstrate that the monthly installment payments cannot be supported by the Debtors' financial performance.

27.     The Debtors have made numerous settlement proposals to PenFed and have attempted to enter into a forbearance agreement with PenFed in exchange for interest payments on the PenFed Loans. PenFed; *however*, has been unwilling to enter into a forbearance agreement with the Debtors and has not responded to the Debtors' most recent settlement proposal for several weeks.

28.     On February 27, 2020, PenFed issued notices of default (the "Notices of Default") for six of the PenFed Loans, which demanded approximately $158,186.00 in payment to be made within 30-days. These six PenFed Loans, like all the PenFed Loans, were secured by collateral held by all of the Debtors, which amounted to all of the Debtors' assets.  Pursuant to the

7

Notices of Default, upon the expiration of the 30-day cure period, PenFed asserted that it would "pursue all rights and remedies available under the loan contract and/or applicable law." The Debtors understand this to mean, that PenFed is intending to execute against the collateral, which is all of the Debtors' assets.

29.     Although the COVID-19 outbreak was already active at the time PenFed issued the Notices of Default, COVID-19 was declared a pandemic by the World Health Organization shortly thereafter. The inhabitants, and employees, of New York City, have been on virtual lockdown ever since. As a result of the COVID-19 pandemic the Debtors have suspended operations for March, April, and possibly May 2020.

30.     In light of the operational, logistical, and financial burdens that the COVID-19 pandemic has bestowed upon the Debtors, the Debtors have requested, on a near daily basis, that PenFed extend the 30-day cure deadline so that negotiations surrounding the PenFed Loans could continue. PenFed, however, has shockingly refused to do so.

31.     The last thing the Debtors wanted to do was file for chapter 11 protection in the midst of the COVID-19 pandemic. However, PenFed has left the Debtors with no choice. The Debtors believe that the breathing spell afforded by chapter 11 will provide them with time necessary to renegotiate the PenFed Loans. In the event that no reasonable modification could be obtained, the Debtors may seek to sell the Taxi Medallions under Bankruptcy Court supervision.

### III.
### Information Required by Local Rule 1007-4

32.     In accordance with Local Rule 1007-4, the schedules attached hereto provide certain information related to the Debtors.

33.     Pursuant to Local Rule 1007-4(a)(i) and Local Rule 1007-4(a)(ii), the Debtors are not small business debtors within the meaning of §101(51B) of the Bankruptcy Code or single asset real estate debtors within the meaning of §101(51B) of the Bankruptcy Code.

34.     Pursuant to Local Rule 1007-4(a)(iii), the nature of the Debtors' business and concise statement of the circumstances leadings to the Debtors' filing under chapter 11 are described above.

35.     Local Rule 1007-4(a)(iv) is not applicable to the Debtors.

36.     Pursuant to Local Rule 1007-4(a)(v), there has not been any committee organized prior to the order for relief in these Chapter 11 Cases.

37.     Pursuant to Local Rule 1007-4(a)(vi), **Schedule 1** is a consolidated list of the holders of the twenty (20) largest general unsecured claims against all Debtors, excluding insiders and creditors holding priority claims, and states whether the claim is contingent, unliquidated, disputed, or partially secured.

38.     Pursuant to Local Rule 1007-4(a)(vii), **Schedule 2** is a consolidated list of the holders of the largest secured claims against all Debtors and provides a description and an estimate of the value of the collateral securing such claims, and whether the claim or lien is disputed.

39.     Pursuant to Local Rule 1007-4(a)(viii), **Schedule 3** contains a summary of the Debtors' assets and liabilities.

40.     Pursuant to Local Rule 1007-4(a)(ix), the Debtors have no publicly traded securities.

41.     Pursuant to Local Rule 1007-4(a)(x), **Schedule 4** lists all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

42.     Pursuant to Local Rule 1007-4(a)(xi), **Schedule 5** lists all of the premises owned, leased, or held under any other arrangement from which the Debtors operate their business.

43.     Pursuant to Local Rule 1007-4(a)(xii), **Schedule 6** lists the location of the Debtors' significant assets, the location of their books and records, and the nature and location of assets, if any, held by the Debtors outside the territorial limits of the United States.

44.     Pursuant to Local Rule 1007-4(a)(xiii), **Schedule 7** lists the nature and present status of each action or proceeding, pending, or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

45.     Pursuant to Local Rule 1007-4(a)(xiv), **Schedule 8** lists the Debtors' existing senior management, their tenure with the Debtors, and a summary of their relevant responsibilities and experience.

46.     Pursuant to Local Rule 1007-4(a)(xv) and Local Rule 1007-4(xvi), **Schedule 9** sets forth the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders, partners and members) for the 30-day period following the filing of the chapter 11 petition and the estimated amount to be paid to the officers, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of these Chapter 11 Cases.

47.     Pursuant to Local Rule 1007-4(a)(xvii), **Schedule 10** contains an itemized schedule, for the 30-day period following the filing of the Debtors' chapter 11 petitions, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables

expected to accrue but remaining unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

48.      Pursuant to Local Rule 1007-4(a)(xviii), **Schedule 11** contains a schedule of the Debtors' current insurance policies, including the identity of the insurer, policy period and type of insurance for each insurance policy listed.

49.      Pursuant to Local Rule 1007-4(a)(xix), **Schedule 12** contains a schedule of the Debtors' bank accounts, including the name and address of the banking institution where the accounts are held, the name on the account, and the nature of the account for each bank account listed.

50.      Pursuant to Local Rule 1007-4(a)(xx), no additional information is necessary pursuant to Local Rule 1007-4(a) to fully inform the Court of the Debtors' rehabilitation prospects.

51.      Notwithstanding anything to the contrary contained in this Affidavit or any schedule attached to this Affidavit, nothing in this Affidavit or any schedule is intended to be, or should be construed as, an admission with respect to (i) the liability for, the amount of, the enforceability of, or the validity of any claim, or (ii) the existence, validity, enforceability or perfection of any lien, mortgage, charge, pledge or other grant of security for any claim, or (iii) the proper characterization of any transaction or financing as a sale or financing.  The Debtor specifically reserves the right to challenge any claim or any transaction or any alleged security for any claim on any and all bases.

## IV.
## First Day Pleadings and Orders

52.      Concurrently with the commencement of this chapter 11 case, the Debtors have filed a number of First Day Pleadings and, at the "first day" hearing, will seek orders

approving those pleadings and associated proposed orders (collectively, the "First Day Orders"). I have reviewed each of the First Day Pleadings and Orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. I believe that the relief sought in each of the First Day Pleadings and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of going concern value, and (b) constitutes a critical element in the Debtors achieving a successful reorganization of their businesses. I further believe that the requested relief is in the best interest of the Debtors estates.

## A.  Creditor Consolidation Motion

53.    The Debtors request that the Court authorize them to prepare a single consolidated list of creditors in the format currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix.

54.    The Debtors estimate that each Debtor has less than 20 creditors, and that each of the Debtors have the same creditors. The Debtors believe that preparing a single list of consolidated creditors will eliminate waste and maximize administrative efficiency in these Chapter 11 Cases.

## B.  Motion to Extend Time to File Schedules

55.    The limited time and resources available to the Debtors to marshal the required information to complete the Schedules and SOFAs, necessitate an extension of the deadline for the Debtors to file those documents. Indeed, as noted above, none of the Debtors have employees, but instead rely on the personnel of Utica Taxi to provide all of their administrative functions. As a result, the Debtors' books and records rest largely with Utica Taxi. The Debtors' are diligently working with Utica Taxi personnel to complete the information required to file the Schedules and SOFAS.

12

56.     I believe that a 28-day extension is necessary due to the coordination of efforts with Utica Taxi personnel that will need to be undertaken to perform the required review of the Debtors' financial records and affairs, the numerous critical operational matters that the Debtors must address in the early days of these Chapter 11 Cases in light of the current COVID-19 pandemic, and the pressure incident to the commencement of these Chapter 11 Cases.

57.     However, I believe that, working together with Utica Taxi, and Griffin Hamersky LLP, the Debtors will be able to file their Schedules and SOFAs within the 28-day extension requested.

## C.      Tax Motion

58.     Prior to the Petition Date, the Debtors in their ordinary course of business likely incurred various state and local sales and use tax liabilities (collectively, the "Taxes").

59.     As of the Petition Date, the Debtors were current in their payment of assessed and undisputed Taxes; *however*, certain Taxes attributable to the prepetition period were not yet due.

60.     The continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby creating a greater recovery for creditors and other stakeholders. If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each taxing authority's applicable laws, and whether penalties, interest, and attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured, or unsecured in nature.

61.    The foregoing is true and correct to the best of my knowledge and belief.


Dated:    Brooklyn, New York
          March 27, 2020


/s/    Joe Pross
          Joe Pross